IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 5, 2025

## STATE OF TENNESSEE v. JOSEPH WERT

**Appeal from the Circuit Court for Carroll County**
**No. 21CR80      Bruce Irwin Griffey, Judge**

_____

### No. W2024-01192-CCA-R3-CD

_____

The Defendant, Joseph Wert, appeals from his conviction for voluntary manslaughter, for which he received a six-year sentence. On appeal, the Defendant contends that (1) the trial court erred by excluding a text message exchange between two non-testifying individuals discussing the victim's statement on the day of the shooting; (2) the trial court erred by allowing the State to read in front of the jury several unauthenticated text messages on the victim's ex-wife's cell phone between the victim, his ex-wife, and their minor daughter; (3) the State committed prosecutorial misconduct during its closing argument when it referenced the text messages between the victim, his ex-wife, and their minor daughter, and the trial court erred by overruling his contemporaneous objection thereto; (4) the trial court erred by refusing to provide a jury instruction regarding the presumed reasonableness of his use of deadly force against the victim pursuant to Tennessee Code Annotated section 39-11-611(c), commonly known as "castle doctrine."; and (5) the evidence was insufficient to support his conviction because the State failed to disprove his self-defense claim beyond a reasonable doubt. Finally, he contends that cumulative error entitles him to a new trial. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

KYLE A. HIXSON, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and STEVEN W. SWORD, JJ., joined.

William D. Massey and Seth M. Segraves, Memphis, Tennessee, for the appellant, Joseph Wert.

Jonathan Skrmetti, Attorney General and Reporter; Johnny Cerisano, Assistant Attorney General; Neil Thompson, District Attorney General; and W. Michael Thorne and Deven Wilson Whitfield, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## I. FACTUAL AND PROCEDURAL HISTORY

This case arises from the January 14, 2020 shooting death of Larry Gene Watkins, Jr. at the Defendant's residence in Carroll County, Tennessee. Following this incident, a Carroll County grand jury indicted the Defendant on April 20, 2021, charging him with first degree premeditated murder of the victim. *See* Tenn. Code Ann. § 39-13-202(a)(1). The Defendant proceeded to a jury trial where he advanced the theory that he shot the victim in self-defense.

At a three-day jury trial beginning on March 23, 2023, the State presented evidence that the victim was the Defendant's employer, and he lived a few houses away from the Defendant on the same street. The victim was also the ex-husband of Brittany Watkins, whom the Defendant was dating at the time of this incident.

Testimony from various witnesses at trial established that, on January 14, 2020, the Defendant and the victim rode together in the victim's truck to Jackson, Tennessee, where they purchased lumber, food, and liquor before returning to the Defendant's residence. Once there, the two men began listening to music outdoors at a nearby lake and drinking liquor to celebrate the Defendant's birthday. At some point, an altercation occurred, and the victim punched the Defendant in the face, leaving him with a swollen, bruised, and bloody lower lip. Following this altercation, the Defendant went inside the residence, retrieved his father's handgun, returned outside, and shot the victim twice, killing him.

The Defendant's mother called 911 sometime after the shooting and asserted that the victim had threatened the Defendant with a gun outside their residence, but she had not been home at the time. In the background of this call, the recording of which was played for the jury, the Defendant made loud exclamations and asserted that he shot the victim "right through the chest and right through the mouth" after the victim "ran up with [his own] gun." The Defendant claimed that he "told [the victim] four times, 'Please go. I have to shoot you if you pull a gun on me.'" The Defendant also repeatedly stated that, although he "didn't want to," he nevertheless "had to" kill the victim.

Tennessee Bureau of Investigation ("TBI") Special Agent Joseph Hudgins, Jr., was the lead investigator in this case, and he interacted with other law enforcement personnel as well as the Defendant once he arrived on the scene. Agent Hudgins described the

Defendant's demeanor that evening as "kind of like fake crying, kind of manic" and as exhibiting "obvious signs that he was intoxicated."

Law enforcement found the victim's body approximately ninety-five feet away from the residence with two fatal gunshot wounds, one through the chest and one through the neck. They observed the victim's truck stuck in the mud some distance away from the Defendant's residence and the victim's shirt lying on the ground between his truck and his body. The victim's truck was situated with its passenger side facing the Defendant's residence, and the windows on that side of the vehicle were fully closed. Mud was visible surrounding the truck. The victim's shirtless body was between the truck and the Defendant's residence, with blood smeared across the torso, hands, neck, and face. A photograph taken of the Defendant at the scene depicted him with injuries on his lower lip and on the bridge of his nose.

Although the Defendant had initially stated that the victim threatened him with a gun, officers did not see a gun in the area surrounding the victim's body. The Defendant then told officers that the victim's gun must be either on his person or in his truck: "He has to have it. It has to be in his truck, or he has to have it." During further processing of the crime scene, officers located a loaded nine-millimeter handgun with the safety turned off inside the victim's front left pants pocket. The victim's gun was not visible until it was removed from his pants pocket and subsequently photographed. Officers utilized metal detectors and flashlights to attempt to locate shell casings around the victim's body, but none were discovered at that time. Agent Hudgins recalled looking in the bed of the victim's truck with a flashlight, upon which he observed it to be "full of stuff," but the single spent nine-millimeter casing, which was later discovered at the TBI Crime Lab, was not visible on the scene. Once the victim's body was rolled over, a bullet was found beneath it on top of the fallen leaves that covered the ground.

Agent Hudgins initially noted that the Defendant's statements on the 911 call were inconsistent with those he had made to officers at the scene. In one such account, the Defendant told officers that the victim left the property but then returned and began firing his gun at the Defendant. The Defendant also claimed at one point that the victim had been firing the gun at him from inside his truck. Based on the absence of shell casings from the victim's gun, and the gun's being discovered "fully sitting inside [the deceased victim's] pocket," Agent Hudgins determined that the evidence was not consistent with the victim's "drawing [his gun] or shooting at [the Defendant]," and all of the Defendant's statements "were in direct conflict with what the evidence at the scene showed."

- 3 -

Notwithstanding the perceived inconsistencies between the evidence at the scene and the Defendant's statements, Agent Hudgins was aware that the victim had a criminal history and a history of violence. He agreed that it was common for men to remove their shirts before engaging in a fist fight and that it was reasonable to assume the victim had done so himself while approaching the Defendant's house to engage in a fight. Agent Hudgins also learned that the victim and the Defendant had been in a physical fight the week before. However, video surveillance footage of the two men during their trip to Jackson on the day of the shooting did not depict any conflict between them, and their continued socializing upon their return was reported to have been voluntary. Multiple residents of the area who saw or interacted with the two men during that time—one of whom characterized their behavior as "cutting up" and "celebrating" together—agreed that the victim and the Defendant appeared to be getting along well. These same residents later reported hearing between three and six gunshots sometime after this, which they stated was not uncommon for the area, but none of them were sure of the timing, location, or number of the shots.

Ms. Watkins testified that she began dating the Defendant shortly after her divorce, and she characterized the Defendant as "a good guy" who was not abusive to her or violent "at all." By contrast, she described the victim as being violent, controlling, and jealous during the last few years of their marriage. Ms. Watkins estimated that the victim drank whiskey every day, which increased his violent tendencies, and he assaulted her at least once per week during that period. Although Ms. Watkins never reported the abuse, the couple's minor daughter witnessed the assaults and called the police on two occasions. Ms. Watkins filed for divorce from the victim after the second time he was arrested for assaulting her. During the incident leading to the victim's second arrest, the victim had threatened her with a shotgun, "told [her] he could kill [her] and not blink an eye," and discharged the weapon into another room of their home. Following their divorce, Ms. Watkins remained in contact with the victim via text message, and their daughter frequently exchanged text messages with the victim by using Ms. Watkins' phone. Ms. Watkins was also aware that a fight between the victim and the Defendant had occurred the week before the shooting, but she recalled the victim reaching out to her afterward to let her know that "everything was okay" between the Defendant and the victim after the fight.

The jury heard from the medical examiner, Dr. Emily Dennison, an expert in forensic pathology, and Dr. Eric Warren, a defense expert in the field of forensic shooting reconstruction. Photographs taken during the victim's autopsy showed: bruising on the victim's left hand and knuckles, which the medical examiner agreed could be consistent with him having punched the Defendant; an entry wound in the left side of the victim's neck with a corresponding exit wound on the right side of the back of his head; and an

entry wound on the left side of the victim's chest with a corresponding exit wound underneath his left shoulder blade. Both Dr. Dennison and Dr. Warren testified that they could not establish which of the two shots occurred first. However, Dr. Dennison opined that both wounds would have been fatal "within seconds to minutes," which would not necessarily preclude the possibility of the victim continuing to move around after being shot. Dr. Dennison explained that the chest wound severed the victim's aorta and several other blood vessels connecting his heart and left lung, "meaning he's going to basically bleed out very quickly." Both experts agreed that the absence of stippling around the victim's wounds indicated that both shots came from two or more feet away, but they were otherwise unable to determine the distance between the Defendant and the victim when either shot was fired.

Following the conclusion of the evidence, the jury convicted the Defendant of the lesser included offense of voluntary manslaughter, which was a Class C felony at the time. *See* Tenn. Code Ann. § 39-13-211 (Repl. 2018). At a later sentencing hearing, he was ordered to serve six years in the Tennessee Department of Correction. The Defendant's motion for new trial was denied after a hearing, and he filed a timely notice of appeal.

## II.    ANALYSIS

The Defendant presents the following claims for our review: (1) the trial court erred by excluding a text message exchange between two non-testifying individuals discussing the victim's statement on the day of the shooting; (2) the trial court erred by allowing the State to read in the presence of the jury unauthenticated text messages between the victim, Ms. Watkins, and their minor daughter contained on Ms. Watkins' cell phone; (3) the State committed prosecutorial misconduct by referencing the text messages on Ms. Watkins' cell phone during its closing argument, and the trial court erred by overruling his contemporaneous objection thereto; (4) the trial court erred by refusing to instruct the jury pursuant to the "castle doctrine" presumption outlined in Tennessee Code Annotated section 39-11-611(c); (5) the evidence was insufficient to support his conviction because the State failed to disprove self-defense beyond a reasonable doubt; and (6) cumulative error entitles him to a new trial. We address each issue in turn below.

### A.    Excluded Text Messages

On appeal, the Defendant asserts that the trial court erred by sustaining the State's objection and, thus, denying him the opportunity to introduce a proffered text message exchange between two non-testifying individuals who knew the victim. According to the Defendant, the evidence was properly offered to show the effect it had on Agent Hudgins'

investigation into the victim's death. The State responds that the messages were not authenticated and were thus properly excluded. Alternatively, the State asserts that the messages contained two levels of hearsay without any applicable exceptions to the second level, which would be required for their admission.

### 1. Pertinent Facts

On cross-examination of Agent Hudgins, defense counsel asked him if he had spoken to any individuals during his investigation who stated that the victim had made prior threats against the Defendant. The State made a hearsay objection, and defense counsel responded that the elicited testimony was "not [being] offered for the truth of the matter asserted. It's [being] offered to look at the integrity of the investigation and the completeness of it and the decision [Agent Hudgins] made to file first-degree murder charges." The trial court overruled the State's objection, and Agent Hudgins confirmed that he had received information from more than one individual about these past threats, possibly as many as three. The following exchange then occurred:

> [Defense Counsel]: And also as part of your investigation, you learned that [the victim], this day, this very day, sent – was the subject of a text – he sent a text. Tell the jury what that text said, please.
>
> [Agent Hudgins]: Do you have a copy of the text I can read, please?
>
> [Defense Counsel]: I do.

Defense counsel then asked Agent Hudgins to read aloud a text message exchange he produced, purported to be between two individuals who knew the victim, but the State once more objected. The following then occurred during a bench conference:

> The Court: Who is this a text from, who to who?
>
> . . . .
>
> [Defense Counsel]: [Mr.] Shumate. It's one of the people that [was] involved that also gave the information that [the victim] was threatening [the Defendant] as well as that he was going to – he would shoot two cops before he let them take him. . . .

- 6 -

The Court: Is this probative [to show] that [the victim] was threatening [the Defendant]?

. . . .

[Defense Counsel]: What it says . . . is, "If anything happens to me today, please go get my puppy."

. . . .

The Court: What does that have to do with anything?

. . . .

[Defense Counsel]: Well, it was saying that one of them was going to die that day.

[The State]: Your Honor, I'd state that this is a text message from Mr. Shumate talking to a woman named Ginger Garrison [].  So, neither of those individuals are here.

[Defense Counsel]: Doesn't matter.

[The State]: This isn't a text message from [the victim] or [the Defendant].

[Defense Counsel]: What matters is, is that part of [Agent Hudgins'] investigation?  Does it go to him making his decision –

The Court: I'm going to sustain the objection.  We're not getting into that.

Defense counsel then requested that he be able to make an offer of proof and that he further be allowed to cross-examine Agent Hudgins about this particular text message exchange. The trial court denied defense counsel's cross-examination request, but it indicated it would allow the defense to make a proffer later in the proceedings.

Following the conclusion of the State's proof, the defense made an offer of proof outside of the presence of the jury regarding the substance of the text message exchange.

Defense counsel tendered a photograph of a cell phone with the partial text message exchange visible on its screen. In the text message exchange, the first individual messaged, "And it's like he [k]new he was going to die," to which the second individual responded, "I know." The first individual then indicated that "he came here first [and] . . . [s]aid if anything happens [to] me go get my puppy." The second individual then asked, "Really[,] when was that?" to which the first individual replied, "Early that day." The State then raised an authentication objection, noting that this was "a picture of a cell phone, not even a picture of the actual text messages that ha[d] been dumped from that phone or anything." The trial court agreed with the State's authentication argument. *See* Tenn. R. Evid. 901(a). ("The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims[.]").

Defense counsel acknowledged that neither party to the text message exchange would appear as witnesses before the court, stating, "I just think it goes to his state of mind that day." The trial court opined that the content of the messages raised "the more logical assumption" that the victim was afraid for his life, rather than indicating that the Defendant had reason to fear the victim. After further discussion of the relevance of the text message exchange, the trial court found the evidence to be "to[o] tenuous and speculative and not relevant. It doesn't meet the standard of probative versus potential prejudice, so I will sustain the State's objection to that."

The Defendant again raised the issue in this motion for new trial. He argued that the trial court erred in sustaining the State's hearsay objection to this text message exchange, noting that its substance was not offered for the truth of the matter asserted, but rather "as evidence of what evidence Agent Hudgins reviewed as part of his investigation prior to charging the Defendant with First-Degree Murder and how that evidence affected his decisions as lead investigator." At the hearing, the trial court again ruled that the text message exchange between these two non-testifying individuals was not relevant to any material issue in the case and failed "to establish bias on the part of Agent Hudgins." Specifically, the trial court reasoned,

> It's the Court's assessment that simply reviewing text messages and making a decision what charging decisions should or should – or what charges and the severity of those charges should be pursued. Again, it's not a decision that the agent actually makes, it's the decision that the District Attorney General's Office makes. So, what the officer did or did not review and what he recommended or didn't recommend based upon that review is

really irrelevant to the elements of the offense that the jury was required to consider in the proof to establish or negate those elements.

## 2.    Waiver

Initially, we note the State argues for waiver on appeal, contending that the Defendant only offered the text messages to prove the victim's state of mind and never contended that the messages were being admitted to establish their effect on the law enforcement investigation into the incident. *See State v. Alder*, 71 S.W.3d 299, 303 (Tenn. Crim. App. 2001) (noting that parties may not change or add theories on appeal). We disagree. Our review of the record leads us to conclude that the Defendant, during his cross-examination of Agent Hudgins, initially asserted that his purpose in offering first the disputed testimony, and later these messages, was to show the effect on Agent Hudgins' investigation. At the same time, defense counsel explicitly stated the evidence was not being offered for the truth of the matter asserted. *See* Tenn. R. Evid. 801(c) (defining hearsay as statements being "offered in evidence to prove the truth of the matter asserted"). Later, during the offer of proof when discussing the purpose for admission of the text messages, defense counsel did not specify whether he was still referring to Agent Hudgins' state of mind as he proceeded with the investigation into the victim's death or if he was now raising a new argument about the victim's state of mind. While it is reasonable to conclude that the Defendant may have later attempted to raise an additional ground justifying the admission of the text message exchange, the record does not clearly establish his departure from the originally stated basis for admission. We thus consider the issue as preserved for appellate review.

## 3.    Relevant Law and Analysis

Although the Defendant addresses only the hearsay issue based upon the State's initial objection to discussion of this text message exchange, it is clear from the record that the focus of the trial court's ruling regarding this text message exchange was that the evidence was not relevant. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Generally, relevant evidence is admissible. Tenn. R. Evid. 402. The court may, however, exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. An appellate court generally reviews a trial court's

decisions regarding the admissibility of evidence for an abuse of discretion. *State v. Davis*, 466 S.W.3d 49, 61 (Tenn. 2015).

The trial court's finding that the messages were inadmissible as overly speculative and irrelevant as to the purpose for which they were offered—establishing threats by the victim against the Defendant—is supported by the record. The proof introduced at trial established that Agent Hudgins knew that (1) the victim and the Defendant had a volatile relationship, (2) their interactions had become violent on more than one occasion, (3) they nonetheless continued to seek out one another's company both professionally and socially, and (4) the Defendant was the individual who twice shot the victim. The Defendant never demonstrated how the messages were relevant to their stated purpose of admission—*i.e.*, their effect on Agent Hudgins' investigation, which was focused on determining whether the shooting was premeditated murder or an act of self-defense. But importantly, the proffered messages contained no threats, supporting a finding that the messages were substantially more prejudicial than of probative value. In fact, the text message exchange supported a belief that the victim was in fear of the Defendant, and it would have been improper, and illogical, to speculate based upon these messages alone that the victim, by communicating some concern for his *own* well-being to a third party, meant his statement as a threat to kill the Defendant. *See, e.g.*, *Ivey v. State*, 360 S.W.2d 1, 5 (Tenn. 1962) ("There is no proof in this record to furnish a logical basis for such an inference, and one so drawn on the evidence in this record would be based on no more than a mere possibility, and in fact would be speculation or conjecture.").

Thus, as the statements at issue here were not relevant, making them inadmissible, we need not determine whether they were hearsay or if they qualified for an exception. The Defendant is not entitled to relief.

### B.     Text Messages on Ms. Watkins' phone

The Defendant next contends that the trial court erred by allowing the State to read aloud purported text message exchanges between the victim and Ms. Watkins and between the victim and the former couple's minor daughter that were contained on Ms. Watkins' phone. The Defendant objected to their admission in the trial court on the basis that these messages were not authenticated, and that the jury heard their content even though the witness, Ms. Watkins, denied any recollection of the messages. He also adds on appeal that the messages were impermissible hearsay "offered purely for the truth of the matter which they assert[ed] and for the prejudicial effect it would have on the jury." The State responds that the Defendant's authentication argument "misses the mark" because authentication was not required as the messages were not received into evidence. To this

point, the State asserts that the messages were used properly to impeach Ms. Watkins' credibility. As to the messages being impermissible hearsay, the State contends this argument is waived given the Defendant's failure to raise a hearsay objection during trial.

### 1. Pertinent Facts

During her direct examination as a defense witness, Ms. Watkins asserted that the victim "wanted his family back, from what [she] understood, but [there was] no going back." Then, on cross-examination, the State questioned the veracity of this assertion by asking Ms. Watkins if she recalled certain text messages between the victim and their daughter, which occurred while their daughter was using Ms. Watkins' phone. The defense objected, and the following exchange occurred:

> [Defense Counsel]: Judge, I object. She's done nothing to authenticate these messages. We don't have a witness that says they pulled them from the phone. We don't have a witness that says what phone they came from. There's nothing to lay a foundation for this.
>
> [The State]: Your Honor, I'd state that I can ask her if she knows a text message is [on her phone]. If she says she doesn't know, she doesn't know.
>
> The Court: Overruled. You may proceed.
>
> [Defense Counsel]: Judge, my fear is that once she asks it, if she reads it off to her, then it's out there. She needs to be able to read it, see if she recognizes it, and then say what it is.
>
> The Court: Overruled. If she says she can't answer it, the jury will know to disregard that evidence.

The State then read aloud the following messages to Ms. Watkins, asking before each if she recalled having seen them on her phone:

> [The victim's daughter via Ms. Watkins' cell phone:] "I wish you'd try to get Mama back, Daddy."
>
> . . . .

[The victim:] "I'm sorry, baby, but it just won't work for us anymore."

. . . .

[The victim's daughter via Ms. Watkins' cell phone:] "You didn't even try, Daddy. I know you and Mama love each other."

Ms. Watkins denied having seen any of these messages, and she noted that it was not her common practice to "go back through" her phone to read the messages between the victim and their daughter. Defense counsel renewed the objection, stating, "This is a conversation between two people who are not in court that she says she can't authenticate." The trial court again overruled the objection, affirming that the State was allowed to ask Ms. Watkins "if she kn[ew]" about the text messages.

The State also read aloud text messages from a purported exchange between Ms. Watkins and the victim, which Ms. Watkins again stated she did not recall:

[Ms. Watkins:] "I'm done with everything. You're right. I am the problem. I won't be anymore."

. . . .

[The victim:] "I didn't say you were a problem. That's the problem. You don't listen to me."

. . . .

[The victim:] "Don't get so drunk, and put your kids first before anything, and most of your problems will go away."

Following this, defense counsel again renewed its previous objection: "She said she doesn't recall a hundred times, and at this point, the prosecutor is testifying." The trial court overruled the objection but instructed the State to "move on." None of the messages were introduced into evidence, but the State did elicit testimony from Ms. Watkins that the victim had never actually tried to rekindle their romantic relationship.

Aside from the trial court's initial ruling, which included a statement in front of the jury that the jury "would know to disregard" the messages' content, the trial court did not specifically instruct the jury regarding these messages, nor did the Defendant make a

request that it do so at that time.  However, during the general charge of the jury, the trial court provided the following instruction:

> A witness may be impeached by proving that he or she has made some material statement out of court which [is] at variance with his or her evidence on the witness stand.  However, proof of such prior inconsistent statement may be considered by you only for the purpose of testing the witness's credibility and not as substantive evidence of the truth of the matter asserted in such statements.
>
> Further, a witness may be impeached by a careful cross-examination involving the witness in contradictory, unreasonable, or improbable statements.  However, immaterial discrepancies or differences in the statements of witnesses do not affect their credibility unless it should plainly appear that some witness has willfully testified falsely.

Also, the trial court twice instructed the jury, first in its preliminary instructions and later in the general charge, that the statements of the attorneys are not evidence.

### 2.	Relevant Law and Analysis

First, we agree with the State that the Defendant's hearsay argument regarding these text messages is waived for his failure to state the same as the ground for his objection in the trial court.  *See* Tenn. R. Evid. 103(a)(1); Tenn. R. Crim. P. 51(b); *see also State v. Vance*, 596 S.W.3d 229, 253 (Tenn. 2020) (stating that the party who wishes to raise an issue on appeal first has an obligation to preserve that issue by raising a contemporaneous objection in the trial court).  Second, addressing the Defendant's issue in the context of an authentication argument, we are constrained to agree with the State that the Defendant's contention in this regard "misses the mark" because authentication was not required as the messages were not received into evidence.  As noted in the previous section, authentication is a prerequisite to establishing the admissibility of evidence, *see* Tenn. R. Evid. 901(a), but these disputed messages were not offered for admission as substantive evidence.[1]  As contemplated by the instruction given by the trial court, electronic communications such as these "'may also be admissible for the limited purpose of impeaching the credibility of' any witness who testifies at trial."  *State v. Johnson*, 538 S.W.3d 32, 61 (Tenn. Crim. App. 2017) (quoting *United States v. Nixon*, 418 U.S. 683, 701 (1974)).  We therefore agree with

---

[1] We also note that, waiver notwithstanding, the Defendant's hearsay argument fails for the same reason as the authentication argument: the messages were not offered for admission as substantive evidence. *See* Tenn. R. Evid. 802.

- 13 -

the State that the Defendant's authentication argument is misplaced and that the crux of the issue involves impeaching Ms. Watkins with prior statements in accordance with Tennessee Rule of Evidence 613.

Rule 613 provides that "[i]n examining a witness concerning a prior statement made by the witness, whether written or not, the statement need not be shown nor its contents disclosed to the witness at that time, but on request the same shall be shown or disclosed to opposing counsel." Tenn. R. Evid. 613(a). Accordingly, the parties may question witnesses about prior statements that are inconsistent with their trial testimony, but when a timely objection is lodged, the jury may only consider such proof as probative of a witness's credibility, not as substantive evidence of the matter asserted in the statement or statements. *See State v. Kiser*, 284 S.W.3d 227, 266 (Tenn. 2009) ("Prior inconsistent statements may be admissible only for the purpose of impeachment and not as substantive evidence." (citing *State v. Martin*, 964 S.W.2d 564, 567 (Tenn. 1998))); *State v. Robertson*, 130 S.W.3d 842, 861 (Tenn. Crim. App. 2003) (concluding that prior witness statements "could be considered as substantive evidence, rather than just for impeachment purposes," when the defense failed to object to their being read aloud (citing *State v. Smith*, 24 S.W.3d 274, 280 (Tenn. 2000))). "The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as trier of fact." *State v. Jones*, 15 S.W.3d 880, 888 (Tenn. Crim. App. 1999). Importantly, "a party may not impeach a witness with a prior statement unless the prior statement is actually that of the witness, and not of a third party." *State v. Nunez*, No. M2024-00179-CCA-R3-CD, 2025 WL 1892446, at *11 (Tenn. Crim. App. July 9, 2025) (first citing Tenn. R. Evid. 613; and then citing *State v. Middlebrook*, No. E2019-01503-CCA-R3-CD, 2021 WL 28582, at *15 (Tenn. Crim. App. Jan. 5, 2021)), *perm. app. pending*. Absent a clear abuse of discretion that results in manifest prejudice to the defendant, this court will not interfere with the trial court's exercise of its discretion on matters pertaining to the examination of witnesses. *State v. Johnson*, 670 S.W.2d 634, 636 (Tenn. Crim. App. 1984) (citing *Monts v. State*, 379 S.W.2d 34 (Tenn. 1964)).

We note that the message sent by Ms. Watkins to the victim was properly used to impeach her testimony. *See* Tenn. R. Evid. 613(a). Ms. Watkins, a defense witness, stated on direct examination that the victim "wanted his family back," implying that the victim would have had reason to be hostile towards the Defendant because the Defendant was dating Ms. Watkins at the time. Likewise, the victim's responses to Ms. Watkins' message could properly be used to provide context for her statement. *See State v. Winters*, 137 S.W.3d 641, 664 (Tenn. Crim. App. 2003) ("[I]t is unfair to permit reference to isolated, unexplained [statements] by the witness and there is no error in allowing the statements to be placed in context." (quoting *State v. Boyd*, 797 S.W.2d 589, 594 (Tenn. 1990))). While

the contextual connection bolstered by use of the victim's messages in response to Ms. Watkins is somewhat thin, it does clarify that the two appeared to be discussing the state of their failed marriage. For these reasons, we conclude that the trial court did not abuse its discretion by allowing the State to use them for the purpose of impeaching Ms. Watkins' credibility during cross-examination.

The messages between the victim and his daughter, however, could not properly be used to impeach Ms. Watkins. The applicable rule of evidence and caselaw provide only for the use of prior statements for impeachment purposes if they include those made by the witness. *See* Tenn. R. Evid. 613; *Jones*, 15 S.W.3d at 893 (concluding that Rule 613 permitted questioning of witnesses about their own prior inconsistent statements for impeachment purposes); *Nunez*, 2025 WL 1892446, at *11 (noting that statements of third parties may not be used to impeach witnesses). As such, the State's use of messages between the victim and his daughter, an exchange that did not include any statements made by Ms. Watkins, was improper. The trial court thus abused its discretion by allowing the State to use these third-party messages to impeach Ms. Watkins. However, we conclude that this error was harmless for the reasons stated below.

These messages may have affected the jury's perception of Ms. Watkins' credibility as a witness, but Ms. Watkins did not observe the shooting or have personal knowledge of the circumstances surrounding it on the day in question. Even if the jury elected to reject the substance of her entire testimony—based solely upon the victim's rejection of their daughter's expressed desire for her parents to reconcile—Ms. Watkins' testimony did not disprove any of the essential elements required for the State to sustain a conviction. Indeed, the testimony Ms. Watkins provided that was most helpful to the defense was her assertion that the victim had a serious history of violence, but the same determination was corroborated by Agent Hudgins' investigation and had already been placed before the jury during his testimony, making her contribution on that point merely cumulative. Also, as we have noted, the jury was twice instructed by the trial court that the statements of the attorneys are not evidence. Accordingly, we cannot conclude that the improperly used text messages affected the jury's ultimate verdict—particularly as the jury was instructed not to consider them for their truth—rendering any error in their being read aloud harmless. *See State v. Williams*, 977 S.W.2d 101, 106 (Tenn. 1998) (noting that jurors are presumed to have followed the instructions of the trial court); *State v. Rodriguez*, 254 S.W.3d 361, 372 (Tenn. 2008) (requiring appellate courts applying the harmless error doctrine to primarily consider the "impact the error may reasonably be taken to have had on the jury's decision-making"). The Defendant is not entitled to relief.

## C.     State's Closing Argument

On appeal, the Defendant contends that the trial court erred by overruling his objection to the State's referencing text messages in its closing argument when the same were not admitted into evidence.  Specifically, he asserts that the State committed prosecutorial misconduct by misstating the evidence, thereby misleading the jury, and by inappropriately arguing facts not in evidence, entitling him to a new trial.  The State responds that the Defendant has not established prosecutorial misconduct, but if the prosecutor's brief reference to the messages was improper, the effect was harmless because the jury was instructed not to consider the messages or arguments of counsel as evidence.

### 1.     Pertinent Facts

During its closing argument, the State made a brief reference to the aforementioned text messages exchanged between the victim and the victim's daughter on Ms. Watkins's phone.  Specifically, the State commented as follows:

> Ms. Watkins testified that [the victim] never tried to get back with her, never tried to rekindle their relationship, so any thought that he was upset that [Ms. Watkins and the Defendant] were together is false.  [The victim had] moved on.  He said in text messages, 'It's over.'  They exchanged that, that he had moved on.  So, the thought that this was a jilted lover doesn't make sense.

The Defendant objected, and a bench conference immediately followed, during which defense counsel noted that the texts "were never placed into evidence," but the prosecutor was now using them in argument "for the truth of the matter asserted."  The trial court responded, "I think the jury charge instructions cover[ed] arguments.[2]  This is simply argument.  It's not proof of the matter asserted."  Defense counsel persisted that the prosecutor's commentary was "misleading," but the trial court overruled the objection.  Returning to its closing argument, the State made no further reference to any text messages.

### 2.     Relevant Law and Analysis

Closing arguments are intended "to sharpen and to clarify the issues that must be resolved in a criminal case." *State v. Banks*, 271 S.W.3d 90, 130 (Tenn. 2008) (citing *Herring v. New York*, 422 U.S. 853, 862 (1975)).  In closing arguments each side should be permitted to "present their theory of the case and to point out the strengths and

---

[2] The record reflects that the trial court instructed the jury prior to the parties' closing arguments.

weaknesses in the evidence to the jury." *Id.* (first citing *Christian v. State*, 555 S.W.2d 863, 866 (Tenn. 1977); and then citing 11 Raybin, *Tennessee Practice: Criminal Practice and Procedure* § 29.01, at 72 (1985)). "Closing arguments in criminal cases have a 'rough and tumble quality' about them . . . because they are traditionally the one place in the trial where the lawyers are given the greatest leeway in their manner of expression." *Id.* at 131 (first quoting *State v. Skakel*, 888 A.2d 985, 1060-61 (2006); and then citing 6 LaFave, *Criminal Procedure* § 24.7(b), at 456-57 (3d ed. 2007)). "[P]rosecutors, no less than defense counsel, may use colorful and forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence . . . or make derogatory remarks or appeal to the jurors' prejudices[.]" *Id.* (first citing *United States v. Mullins*, 446 F.3d 750, 759 (8th Cir. 2006); and then citing *State v. Reid*, 164 S.W.3d 286, 320-21 (Tenn. 2005)).

This court has recognized five general areas of improper argument by the State: (1) Intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing a personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant; (3) making an argument calculated to inflame the passions or prejudices of the jury; (4) making an argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict; and (5) intentionally referring to or arguing facts outside the record unless the facts are matters of common public knowledge. *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003). Moreover, "[t]he prosecution is not permitted to reflect unfavorably upon defense counsel or the trial tactics employed during the course of the trial." *State v. Gann*, 251 S.W.3d 446, 460 (Tenn. Crim. App. 2007) (citations omitted).

However, criminal convictions should not be lightly overturned based solely on the prosecutor's closing argument. *Banks*, 271 S.W.3d at 131 (citations omitted). Our supreme court has observed that "argument of counsel is a valuable privilege that should not be unduly restricted." *Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975). Instead, "[a]n improper closing argument will not constitute reversible error unless it is so inflammatory or improper that i[t] affected the outcome of the trial to the defendant's prejudice." *Banks*, 271 S.W.3d at 131 (citations omitted). To measure the prejudicial impact of established misconduct, this court should consider: "(1) the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecution; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case." *Goltz*, 111 S.W.3d at 5-6 (citing *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)). We review a trial

court's exercise of control over closing arguments for an abuse of discretion. *Id.* at 5 (citing *Smith*, 527 S.W.2d at 739).

During the State's closing argument, the prosecutor asserted to the jury, as fact, that the victim had communicated to Ms. Watkins that their relationship was "over" and "that he had moved on." We agree with the Defendant that this was improper. None of the text messages from Ms. Watkins' phone were entered into the record as substantive evidence; rather, they were only admissible to the extent they could be considered to impeach her credibility as a witness. Moreover, according to Ms. Watkins, although the messages were contained on her phone, she had no knowledge of the message indicating that the relationship was over. Contrary to the prosecutor's assertion, the referenced text messages were communication between the victim and the couple's minor daughter, not between Ms. Watkins and the victim. Therefore, this portion of the State's argument was a reference to facts outside the record, the private content of which certainly was not a matter of common public knowledge, and this misstatement had the potential to mislead the jury. *See id.* at 6. Accordingly, the Defendant has identified two of the five *Goltz* factors as being applicable to the prosecutor's conduct in this case, both of which were noted during the bench conference following his objection at trial. We conclude that the trial court abused its discretion by overruling the objection and failing to give a curative instruction to the jury regarding the prosecutor's comments.

Having identified this error, the question then becomes to what degree the Defendant was prejudiced by it. *See id.* at 5. Initially, we conclude that, under the facts and circumstances of this case, the text messages at issue were of minimal importance. *See Goltz*, 111 S.W.3d at 5. The subject matter of the messages was the state of the victim's relationship with his ex-wife, which, as demonstrated by the lack of evidence introduced on this point, was not a material issue at trial. Thus, the reference to these messages had no connection to the relative strengths or weaknesses of the case. *See id.* at 6. Additionally, we note that, even though the Defendant's objection was overruled, the State did not make any further reference to text messages during the remainder of its closing arguments. Although no curative measures were undertaken by the trial court following the bench conference, the record reflects that the trial court had previously instructed the jury that the comments of attorneys were not evidence. This instruction expressly embraced both the prosecutor's reading of the text messages during Ms. Watkins' testimony and the later reference to them during closing argument, creating the presumption that the jury did not consider the messages in rendering its verdict. *See Williams*, 977 S.W.2d at 106. For these reasons, we conclude that the prejudicial impact of the prosecutor's fleeting reference to the messages was harmless. *See Goltz*, 111 S.W.3d at 5-6; *Rodriguez*, 254 S.W.3d at 372. The Defendant is not entitled to relief.

D.    Requested Jury Instruction

The Defendant argues on appeal that the trial court erred by refusing to give the "castle doctrine" instruction, codified in Tennessee Code Annotated section 39-11-611(c). To this point, the Defendant claims that, after he told the victim to leave his property, he ran to his house when the victim "forcibly re-entered the premises" while firing his weapon at the Defendant. The State responds that the victim was never inside or near the Defendant's residence, making the requested instruction inapplicable to the circumstances of the offense.

1.    Pertinent Facts

At the close of the State's proof at trial, the Defendant requested that the jury be instructed regarding the rebuttable presumption of the "castle doctrine" found in Tennessee Code Annotated section 39-11-611(c), *i.e.*, a person who uses reasonable force, including deadly force, inside his residence or dwelling is presumed to hold "a reasonable belief of imminent death or serious bodily injury . . . when that force is used against another person, who unlawfully and forcibly enters or has unlawfully and forcibly entered" the residence or dwelling. According to the Defendant, subsection (c) of the self-defense statute was applicable because "residence . . . under the statute also include[d] the curtilage of the property." The Defendant argued that the victim had been told to leave the property by the Defendant but returned, and that the victim was, therefore, unlawfully present on the Defendant's property when the Defendant shot him. The trial court indicated that it would revisit the issue if necessary prior to delivering its final instructions to the jury. Following the conclusion of the defense's proof, the trial court denied the request, ruling that it did not "think there's any proof one way or the other whether somebody was there lawfully or unlawfully." Although the trial court did not instruct the jury on the presumption requested by the Defendant, it did give the pattern instruction on self-defense in the subsequent charge to the jury.

2.    Relevant Law and Analysis

The United States Constitution and the Tennessee Constitution guarantee a right to trial by jury. U.S. Const. amend. VI; Tenn. Const. art. I, § 6. "This right encompasses an entitlement to 'a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions.'" *State v. Fayne*, 451 S.W.3d 362, 373 (Tenn. 2014) (quoting *State v. Dorantes*, 331 S.W.3d 370, 390 (Tenn. 2011)). The trial court is tasked with providing this "complete charge" to the jury. *State*

*v. James*, 315 S.W.3d 440, 446 (Tenn. 2010) (quoting *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)).  The jury instructions must correctly, fully, and fairly set forth the applicable law.  *State v. Brooks*, 277 S.W.3d 407, 412 (Tenn. Crim. App. 2008).  The instructions must be reviewed in their entirety rather than examining individual phrases in isolation.  *Id*.  Because challenges to a trial court's jury instructions are a mixed question of law and fact, our review is de novo with no presumption of correctness.  *Fayne*, 451 S.W.3d at 373.

Regarding the instruction requested by the Defendant in this case, Tennessee's self-defense statute provides the following:

> Any person using force intended or likely to cause death or serious bodily injury within a residence, business, dwelling or vehicle is presumed to have held a reasonable belief of imminent death or serious bodily injury to self, family, a member of the household or a person visiting as an invited guest, when that force is used against another person, who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence, business, dwelling or vehicle, and the person using defensive force knew or had reason to believe that an unlawful and forcible entry occurred.

Tenn. Code Ann. § 39-11-611(c).  This statute defines the term "residence" as "a dwelling in which a person resides, either temporarily or permanently, or is visiting as an invited guest, or any dwelling, building or other appurtenance within the curtilage of the residence."  *Id.* § -611(a)(8).  "'Curtilage' means the area surrounding a dwelling that is necessary, convenient and habitually used for family purposes and for those activities associated with the sanctity of a person's home."  *Id.* § -611(a)(3).  Finally, while "appurtenance" is not defined within the statute, this court has previously observed that "Black's Law Dictionary defines 'appurtenance' as '[s]omething that belongs or is attached to something else' and provides by way of example that a garden is an appurtenance to the home."  *State v. Williams*, No. M2012-00902-CCA-R3-CD, 2013 WL 3947122, at *11 (Tenn. Crim. App. July 30, 2013) (citing *Black's Law Dictionary* (9th ed. 2009)).

While the trial court gave a complete jury instruction on self-defense, it did not instruct the jury on the presumption of reasonableness in the home, as requested by the defense.  An instruction on a general defense may not be submitted to the jury unless it is fairly raised by the proof.  *See* Tenn. Code Ann. § 39-11-203(c); *State v. Perrier*, 536 S.W.3d 388, 403 (Tenn. 2017).  To make this determination, the trial court must consider the evidence introduced at trial in the light most favorable to the defendant and draw all

reasonable inferences in favor of the defendant. *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013).

For the presumption of reasonableness to apply to a defendant's actions, the victim must have unlawfully and forcibly "entered" a residence, dwelling, business, or vehicle while the defendant was also within that statutorily protected structure. *See* Tenn. Code Ann. § 39-11-611(c). This court has not considered the "curtilage . . . [to be] a part of the residence for purposes of the self-defense instruction." *State v. Meyer*, No. E2009-02294-CCA-R3-CD, 2010 WL 4618352, at *11 (Tenn. Crim. App. Nov. 16, 2010) (concluding that the statutory presumption was not applicable when the defendant shot the victim after the two fought on the land surrounding his home). Expanding upon that distinction, this court has observed that "[u]nder the statute . . . a residence includes only any appurtenance within the curtilage," rather than embracing any entry upon the entirety of the curtilage. *Williams*, 2013 WL 3947122, at *12.

Although the Defendant focuses only on the nature of the victim's *approach* to the residence, the statute requires an actual *entry* that is not supported by the facts in this case. No proof was introduced to establish that the area where the victim's body was found constituted an "appurtenance within the curtilage of the residence," only that it was outside and adjacent to the residence. Additionally, no proof was introduced in support of the Defendant's assertion that this area was, in fact, even part of the curtilage of his home. As such, we cannot conclude that the Defendant was entitled to have this instruction given to the jury, regardless of the circumstances attending the victim's presence nearly one hundred feet away from the residence. *See State v. Black*, No. W2021-01435-CCA-R3-CD, 2023 WL 6878622, at *6 (Tenn. Crim. App. Oct. 18, 2023) (concluding that the proof must show that there was an actual unlawful and forcible entry into the residence or dwelling, not merely force used outside in the yard, and that the defendant's force was used while the defendant was inside the residence or dwelling, not after stepping outside); *State v. Gayden*, No. W2011-00378-CCA-R3-CD, 2012 WL 5233638, at *13 (Tenn. Crim. App. Oct. 23, 2012) (concluding that the trial court did not err in refusing to instruct on the presumption when the defendant shot the victim "outdoors on the land adjoining the home"). The Defendant is not entitled to relief.

E.      Sufficiency of the Evidence Regarding Self-Defense

The Defendant asserts that the State failed to prove beyond a reasonable doubt that he did not act in self-defense, making the evidence insufficient to support his conviction for voluntary manslaughter. The State responds that it disproved the Defendant's claim of

self-defense beyond a reasonable doubt and that the evidence, therefore, was sufficient to support his conviction.

The United States Constitution prohibits the states from depriving "any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. A state shall not deprive a criminal defendant of his liberty "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). In determining whether a state has met this burden following a finding of guilt, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, the defendant has the burden on appeal of illustrating why the evidence is insufficient to support the jury's verdict. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). If a convicted defendant makes this showing, the finding of guilt shall be set aside. Tenn. R. App. P. 13(e).

"Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Appellate courts do not "reweigh or reevaluate the evidence." *Id*. (citing *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978)). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Therefore, on appellate review, "the State is entitled to the strongest legitimate view of the trial evidence and all reasonable or legitimate inferences which may be drawn therefrom." *Cabbage*, 571 S.W.2d at 835.

"If proven to the satisfaction of the jury, self-defense is a complete defense to crimes of violence." *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993) (first citing *Arterburn v. State*, 391 S.W.2d 648 (1965); and then citing *Grainger v. State*, 13 Tenn. (5 Yer.) 459, 462 (Tenn. 1830)). Tennessee Code Annotated section 39-11-611(b), which governs such claims of self-defense, provided in relevant part at the time of the Defendant's offense as follows:

(1) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

- 22 -

(2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

> (C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b) (Supp. 2017). When self-defense is fairly raised by the evidence, the State carries the burden of proof to negate the defense beyond a reasonable doubt. *See* Tenn. Code Ann. § 39-11-201(a)(3); *State v. Benson*, 600 S.W.3d 896, 903 (Tenn. 2020).

A defendant's conduct and mental state must meet an objective standard of reasonableness for the conduct to be justified under this statutory defense. *State v. Bult*, 989 S.W.2d 730, 732 (Tenn. Crim. App. 1998). To evaluate claims of self-defense, the jury must decide "whether the defendant's belief in imminent danger was reasonable, whether the force used was reasonable, and whether the defendant was without fault." *State v. Renner*, 912 S.W.2d 701, 704 (Tenn. 1995). Reliance on self-defense is not limited to the exact moment of a defendant's use of force, but it may be considered in connection with the entirety of the events leading to the offense. *Ivy*, 868 S.W.2d at 727.

It is well-established "that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact." *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997) (citing *Ivy*, 868 S.W.2d at 727). As such, "in the context of judicial review of the jury verdict, in order to prevail, the defendant must show that the evidence relative to justification, such as self-defense, raises, as a matter of law, a reasonable doubt as to his conduct being criminal." *State v. Clifton*, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994).

Viewed in the light most favorable to the State, the proof in this case shows that the Defendant went inside his residence and retrieved a gun after the victim had punched him

in the face outside some distance away from the residence. This was not the first time the two men had been in a physical altercation, but on this occasion, the Defendant shot the victim in the side of the neck and in the chest, killing him where he stood, which was approximately ninety-five feet away from the residence. After the shooting, the Defendant recounted approximately where he had shot the victim on his body, claimed to have shot the victim in self-defense, and repeatedly stated that he "had to" kill the victim. Law enforcement responding to the scene rejected the Defendant's account of events as unsupported by the evidence they discovered there, including the absence of shell casings from the victim's gun, and the location of the victim's gun inside his pants pocket, both tending to establish that he had not threatened the Defendant with this weapon.

By considering this physical evidence and the officers' corresponding testimony, a rational juror could conclude beyond a reasonable doubt that the Defendant did not act in self-defense. *See Williams*, 2013 WL 3947122, at *10 (concluding that the evidence was sufficient to support the jury's finding that the defendant did not act in self-defense by shooting the victim, even though officers later found a gun in the victim's pocket). As such, the jury, although instructed that self-defense was a complete defense to all crimes of violence, reasonably rejected the Defendant's claim of self-defense, as was its prerogative. *See Ivy*, 868 S.W.2d at 727; *Grace*, 493 S.W.2d at 476. Accordingly, the evidence was sufficient to support the Defendant's conviction for voluntary manslaughter. The Defendant is not entitled to relief.

### F.     Cumulative Error

The Defendant finally alleges that cumulative error entitles him to a new trial. The cumulative error doctrine applies when there have been "multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). To that end, more than one actual error in the trial court proceedings must exist before the cumulative error doctrine can apply. *Id*. at 77.

Although we have identified two errors in the Defendant's trial proceedings, their aggregate effect was not so great as to undermine the fairness of the proceedings. *See id.* at 76. Even coupled together, the improperly recited text messages used to formulate the prosecutor's cross-examination questions and the prosecutor's improper, but brief, misstatement of the facts in evidence during closing argument bore no relation to the shooting itself or the essential elements of the conviction offense. Additionally, the jury was expressly instructed not to consider the questions, statements, or arguments of counsel

as evidence when rendering its verdict, and it was also instructed to consider impeachment evidence only for purposes of assessing a witness's credibility. The jury is presumed to have followed those instructions. *See Williams*, 977 S.W.2d at 106. The messages, and the prosecutor's use of them, pertained only to a collateral issue and had no bearing on the crucial moments leading to the victim's death. Therefore, the Defendant's right to a fair trial was preserved in this instance. *See State v. Gilliland*, 22 S.W.3d 266, 273 (Tenn. 2000). The Defendant is not entitled to relief.

## III. CONCLUSION

Based upon the foregoing and consideration of the record as a whole, we affirm the judgment of the trial court.

 s/ Kyle A. Hixson

KYLE A. HIXSON, JUDGE
